IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
At CHATTANOOGA

| | |
|---|---|
| DR. WILLIAM ALEXANDER, | ) |
| Plaintiff, | ) |
| v. | ) CASE NUMBER: CV / 09-CV-27 |
| | ) Collier/Carter |
| PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY | ) |
| Defendant. | ) |

## COMPLAINT

Comes now the Plaintiff, Dr. William Alexander ("Alexander"), and hereby files his Complaint.

## PARTIES

1. The Plaintiff, Dr. William Alexander, is a citizen of the state of Washington over eighteen years of age.

2. Defendant, Provident Life And Accident Insurance Company ("Provident") is a corporation that is not a citizen of Washington, which maintains its principal place of business in Chattanooga, Tennessee.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship among the parties and the matter at issue involves more than $75,000.00 exclusive of interest, cost and attorney's fees. Venue is proper in this District as some of the acts giving rise to Plaintiff's claim happened in this forum. The Court can assert personal jurisdiction over Provident without offending traditional notions of due process because this defendant conducts business in this venue.

## STATEMENT OF FACTS

4. Alexander submitted an application for disability benefits with Defendant in May of 1991. As part of the application process, Alexander was asked whether he had ever used barbiturates, narcotics, excitants or hallucinogens or ever sought treatment or been arrested for their use. Alexander responded "no" to the question. Likewise, Alexander responded "no" to the question whether he ever sought help or treatment for alcohol use.

5. After reviewing his application, Provident issued a policy to Plaintiff identified as William Alexander MD 06-337-7058538, attached hereto as Exhibit "A."

6. According to Alexander's policy, "Total Disability or totally disabled means that due to Injuries or Sickness:

   1. you are not able to perform the substantial and material duties of your occupation; and
   2. you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you." See Page OC-1 of Exhibit A.

7. The policy further provides that "your occupation means that occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, **we will deem your specialty to be your occupation.**" (bold added) See Page OC-2 of Exhibit A.

8. Dr. Alexander's specialty is clinical anesthesiology.

9. Several years after the policy was issued, Alexander became depressed and addicted to opiates. In August of 2001, Alexander underwent treatment for his addiction to opiates. Alexander returned to work in January of 2002 and severely relapsed in August of 2002 almost resulting in death. After this relapse, in November of 2002, Alexander applied for

2

benefits under his policy from Provident. The attending Physician's Statement of Alexander's claim form was signed by Dr. Dell Braunsdorf, and it stated: "should not practice anesthesiology, risk of relapse into chemical dependency is far too great. . . Patient cannot work in anesthesiology."

10. Provident eventually acknowledged Alexander's claim and began paying benefits in accordance with the terms of the policy. Provident paid benefits to Dr. Alexander using an initial date of disability of August 23, 2002, and paid those benefits through October 21, 2007, when it improperly discontinued paying the benefits under the policy.

11. In April 2003, Provident had Alexander's medical records reviewed by one of their paid psychiatrists, who suggested that an Independent Medical Examination ("IME") be obtained. Dr. Debra Osterman, Board certified in Forensic and addiction Psychiatry, performed the IME and found that Alexander was seriously impaired from performing his duties in the practice of anesthesiology because of a recent episode of relapse on the part of Alexander.

12. Not satisfied with Osterman's independent findings, Provident's paid physician contacted Dr. Osterman about her conclusions. She stated that she had no doubt that Alexander had relapsed while at work, which led to his resignation and a major depressive episode on the part of Alexander. She further noted Alexander's inability to practice safely and serious suicidal ideation.

13. In December of 2004, Alexander forwarded to Provident a copy of a Non-Public Agreed Order with the TSBME, which among other things restricted Alexander's medical license, provided that he be subject to drug screens, and participate in ongoing therapy. Because of the restrictions on his medical license, Alexander sought employment with Cedra Corporation

3

as a medical director. This position was research based and did not involve the practice of anesthesiology.

14. In April of 2006, Alexander resigned from Cedra Corporation after the company filed for bankruptcy protection.

15. One month later, Alexander became medical director with Zymogenetics, Inc. in Seattle Washington. Again, this position was research based and did not involve the practice of anesthesiology.

16. In October of 2007, Provident had their paid psychiatrist review Alexander's file. After noting that Alexander had made a recovery from his opiate dependence over the past five years, the psychiatrist acknowledged that the "primary issue to be addressed would be the 'risk of relapse' **which his providers and a distant Psychiatric IME evaluator have historically viewed as high.**" (bold added)

17. It should be noted that "risk of relapse" in the context of an anesthesiologist, who has already relapsed one time, poses a significant chance of DEATH to the physician!

18. Attached hereto as Exhibit "B" is a report entitled "*Substance Abuse in Anesthesia Providers: An Update*, written by Roberta Hines, M.D. at New Haven, Connecticut. In this paper she makes several observations regarding Anesthesiologists and drug addiction. She notes that although anesthesiologists comprise only 3.6% of all physicians in the United States they account for 12-15% of physicians seeking treatment for drug dependency. She further notes that 65% of anesthesiologists (combining resident and attending physicians) with a documented history of addiction are associated with academic departments, and traditionally the drugs of choice selected for abuse by anesthesiologists are fentanyl and sufentanil, followed by merperidine and morphine.

19. Not surprisingly, Dr. Alexander fits the classic profile as outlined in the report. He taught at Baylor University as an Associate professor of Anesthesiology in an academic setting and abused fentanyl and morphine.

20. The paper further explains: "The principal risk to the anesthesia providers with addictive disease include: **increased risk of death for suicide by drug overdose and drug related death.** Unfortunately, the relapse rate for anesthesiologists is the highest of all physicians with a history of narcotic addiction. The risk of relapse is greater in the first 5 years (19%) and decreases as time in recovery increases. The positive news is that 89% of anesthesiologists who complete treatment and commit to `aftercare' remain abstinent for >2 years. **However, death remains the primary presenting symptom of relapse in opiate addicted anesthesiologists!**" (bold added)

21. Finally, the paper concludes that "[a]lthough there are differences in reported relapse rates, the overall relapse rate appears to be about 14% per year for residents and practitioners, this includes all substances. However, a slightly higher relapse rate was observed in those with a history of addiction to opioids."

22. In February of 2008, Dr. Alexander's therapist wrote Provident a letter, Exhibit "C" attached hereto, in which he stated in relevant part:

> I have been Dr. William Alexander's psychiatrist and addictionist since 2003. I have treated him for his opiate addiction and for depression. He has been & sober since 2003 and has suffered from anxiety and depression, but has been treated with medication and therapy with some success. **He tried to return to anesthesia in 2002 after his inpatient treatment in 2001, but relapsed dangerously. . . .It has been my opinion and is my opinion that is unsafe for him to return to the practice of anesthesia.** He would certainly be very prone to relapse if this was done. **I recommend he never practice anesthesia due to his chemical dependency problem and depression.**" (bold added)

23. Provident's determination that Dr. William Alexander can return to the practice of anesthesiology is in direct conflict with his own treating physician's diagnosis and prognosis. In fact, if Dr. Alexander attempted to return to the practice of anesthesia it probably would be a death sentence given the reported studies regarding relapse among this group of physicians.

24. Moreover, Provident has been in possession of information since 2003, in the form of Dr. Osterman's IME report that has informed Provident that Dr. Alexander cannot and should not return to the practice of anesthesiology. In her IME report, she responds to question 7(d): What is the likelihood that the claimant would be able to return to work assuming proper and sincere motivation? She answers: "As an anesthesiologist: Doable (aside from Board order forbidding) **but likely to lead inexorably to suicide**.! (bold added) In response to question 7(e): What would be an expected timetable for work return assuming proper motivation on the claimant's part? She answers: (I won't address the insured's returning to work as an anesthesiologist as I would consider such disastrous – even if there were no Board order forbidding this.)"

25. Dr. Osterman's response to question 7(f)(ii) of the IME fully demonstrates the bad faith that Provident has engaged in contending that Plaintiff could return to the practice of anesthesiology. The question asks: What types of treatment and safeguards would be recommended to support his sustained remission if he were to return to work as an anesthesiologist? In response, Dr. Osterman explained:

> **Realistically, there is no way in which Dr. Alexander (even without Board order prohibiting it) could return to the practice of anesthesiology.** In a scenario bordering on the ridiculous, even if he were to be accompanied constantly by two 'keepers' (two so that they could go to the toilet privately although the subject could not), it would not be possible to pay them enough so that they would be immune from bribes. Furthermore, as months went by without relapse to opioid use, human nature would dictate that the watchers' attention would eventually wane, thereby offering the opportunity for relapse."

6

26. On December 8, 2004, Provident had Steve Snelson meet Dr. Alexander for a field interview. During this interview Dr. Alexander informed Snelson that "he had read too many negative articles and court ruling against UnumProvident on the internet and simply did not trust the company." Snelson reassured Dr. Alexander that "**UnumProvident would never close his claim unless there were severe issues or no longer medically supported. . .**" (bold added)

27. The negative information about UnumProvident that Dr. Alexander referred to was an examination by the insurance departments of the states of Maine, Massachusetts, and Tennessee of Provident Life and Accident Insurance Company to determine if the individual and group long term disability income claim handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972)* or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

28. Attached hereto as Exhibit C is a copy of story provided on the Massachusetts' Consumer Affairs and Business Regulation website. It states in relevant part:

The multistate market conduct examination identified several claims handling practices of concern to the state insurance regulators, including:

- excessive reliance on in-house medical staff to support the denial, termination, or reduction of benefits;
- **unfair evaluation and interpretation of attending physician or independent medical examiner reports**;
- failure to evaluate the totality of the claimant's medical condition; and
- **an inappropriate burden placed on claimants to justify eligibility for benefits.**
(bold added)

7

29. Dr. Alexander experienced similar treatment from Provident as outlined by the multistate examination when they evaluated his claim for benefits. As previously noted, when Dr. Alexander submitted his original claim in November of 2002, the attending physician's statement of Dr. Dell Braunsdorf stated: "should not practice anesthesiology, risk of relapse into chemical dependency is far too great. . . Patient cannot work in anesthesiology. Thereafter, in 2003, Dr. Osterman informed Provident in her IME that Dr. Alexander's "returning to work as an anesthesiologist [would be] disastrous – even if there were no Board order forbidding this," and Dr. Osterman further noted that any such attempt would "**likely lead inexorably to suicide**." (bold added)

30. Two years later, in June of 2005, Dr. William Loving filled out a Physician/Therapist Questionnaire on Dr. Alexander. In Section IV, related to drugs and alcohol, he responded that Dr. Alexander had a history of "opioid dependence as [an] anesthesiologist," and although he has been "sober [he] cannot work with or around opioids." Furthermore, in response to whether he anticipated "the insured's return to part-time work or full-time work in their prior occupation," Dr. Loving unequivocally stated: "No – cannot safely do anesthesiology – cannot handle or be around opioids." Another document dated July 15, 2005, from Dr. Loving to Provident further stated that Dr. Alexander <u>had not been released</u> to work in his occupation and that they expected date to be released to work in his occupation was **<u>never</u>**. (bold and underline added)

31. In October of 2005, Dr. Alexander's drug counselor, Cindy Wheeler, responded to a Provident Physician/Therapist questionnaire and told Provident that Dr. Alexander reported a craving for opioids, and that Dr. Alexander's girlfriend confirmed that Dr. Alexander appears

8

to experience severe cravings for opioids. She further reported seeing Dr. Alexander on a weekly basis based upon her client's needs for therapy.

32. After receiving the material from Cindy Wheeler, Provident employee Chin Sun sent a Clinical Review request to Andrew Carlson requesting that he answer the following questions: based on the updated medical records, does it appear his R&Ls continue to prevent him from returning to anesthesiology; and, do you recommend another IME to help clarify the extent of his impairment? In response to this inquiry, Carlson stated:

> Chin, thanks for the referral. Basically there is nothing new to report here. The insured does not appear to have any clinical restrictions or limitations except **the risk of relapsing should he have ready access to opiates – which he likely would as an anesthesiologist. This situation is not going to resolve. The insured is going to have this problem for the rest of his life**. This is the reason that decreased handling was suggested by Dr. Ursprung in January of this year. We can certainly have a conversation **about his relatively high level of functioning (GAF-90), but this is irrelevant to his specific problem**. As a result, I do not recommend an IME because we currently understand what is happening here and we have no need for clarification. (bold added)

33. On July 28, 2006, Dr, Loving submitted an Attending Physician's Statement and stated that Dr. Alexander "cannot safely be around opiates & therefore cannot practice anesthesiology." As for limitations, he stressed that Dr. Alexander "stay away from opiods."

34. Likewise, in November of 2006, Provident received a letter from Cynthia Wheeler stating that Dr. Alexander "has been under my care since 12/20/2001 for opioid dependence" and "due to his drug of choice it is my recommendation that he not return to practicing anesthesiology."

35. Once Provident realized it had to pay Dr. Alexander benefits for life under the policy, it began searching for different ways to either deny or limit the claim. As part of its plan, it contacted Baylor University to obtain a description of his job duties and responsibilities. Provident contacted Baylor in 2006 for this information, although Dr. Alexander's claim for

9

disability had been pending with the company since November of 2002. In February of 2007, Provident received an e-mail from Frances Coe stating that "William Alan Alexander, MD was employed full-time (working 60 hours per week plus call) in the Department of Anesthesiology as an Associate professor from 02/21/00 to 07/31/2002 assigned to the Fondren-Brown cardiovascular operating rooms at The Methodist Hospital providing patient care and training residents, fellows, and SRNAs."

36. In April of 2007, Dr. Loving again filled out a Psychiatric Assessment Form on Dr. Alexander and again reiterated that Dr. Alexander had "severe opiate dependence" and that he "relapsed when he tried to go back to anesthesia." He further stated that Dr. Alexander had "a job with a research Co. not anesthesia." Finally, Dr. Loving again stated that Dr. Alexander **"cannot safely ever practice anesthesiology due to widespread use of opiates in the field."** (bold added)

37. Six months later, in October of 2007, Dr. Wheeler returned a Psychiatric Assessment Form to Provident that stated that she would defer a complete diagnosis to Dr. Alexander's psychiatrist. In any event, the form stated in relevant part: (1) "client has returned to work, however he is not working as an anesthesiologist due to his addiction;" (2) "No, this individual cannot return to work as an anesthesiologist;" (3) "client is currently working full time, but not as an anesthesiologist;" (4) "not as an anesthesiologist."

38. Notwithstanding the foregoing information, Provident referred Dr. Alexander's claim file to a Cheryl Eder for review to determine whether Dr. Alexander could return to the practice of anesthesiology. Importantly, this person quotes from Dr. Loving's 4/20/07 Physician statement to show a GAF of 85, opiate dependence and MDD in remission, and that Dr.

10

Alexander is taking Wellbutrin and Lexapro. Importantly absent from the report, however, is any mention whatsoever of the information quoted at length in paragraph 36 supra.

39. Further, Provident had its paid medical consultant, a Dr. John Szlyk, contact Dr. Loving and ask questions regarding Dr. Alexander's condition. Szlyk sent a letter dated October 24, 2007, to Loving documenting a conversation they had relating to Dr. Alexander. One week later, Provident made a decision based upon Szlyk's recommendation that Alexander no longer met the definition of total disability as contained in the policy. The decision states in part:

> A peer call (October 24, 2007) had confirmed the insured's clinical progress with sustained sobriety in the context of a strong recovery program, good control of his depression with antidepressant medication, his success in his work, and his recent GAF score of 85. Given this positive clinical course over the past 4 years, the AP noted it was difficult to assess the risk of relapse but felt the insured could not safely return to his former work in the OR as the AP seriously questioned whether any Anesthesiologist could return to such practice, especially given the insured's relapse in 2002. While the AP stated the insured could not return to the OR as an Anesthesiologist, my review of the insured's clinical course and treatment has indicated the insured's risk of relapse was reduced to his former work given (a) the insured's strong recovery over several years, (b) the good control of the depression with an unchanging antidepressant regimen, (his success in new professional positions over the past 2 ½ years, and (d) his GAF scores of 85 or higher.

40. The foregoing statements are pre-textual on the part of Provident and were made in bad faith and ignore the full record in this matter. First, although the insured has only had one relapse in 2002, the fact that he has been sober has been achieved without being in a setting where opiates are easily accessible such as practicing anesthesiology. Second, all of his medical providers have consistently counseled against a return to his prior occupation of practicing anesthesiology. Third, while Dr. Alexander has made progress over the years, it is precisely because he has not been around opiates in a non-clinical setting. Indeed, both of his work positions have been in a research capacity. Finally, as previously noted, his GAF score has nothing to do whatsoever with the likelihood of him relapsing if he practiced anesthesiology.

11

41. Moreover, the foregoing findings of Provident fly in the face of the previous statements of Andrew Carlson which stated:

> Chin, thanks for the referral. Basically there is nothing new to report here. The insured does not appear to have any clinical restrictions or limitations except **the risk of relapsing should he have ready access to opiates – which he likely would as an anesthesiologist. This situation is not going to resolve. The insured is going to have this problem for the rest of his life**. This is the reason that decreased handling was suggested by Dr. Ursprung in January of this year. We can certainly have a conversation **about his relatively high level of functioning (GAF-90), but this is irrelevant to his specific problem**. As a result, I do not recommend an IME because we currently understand what is happening here and we have no need for clarification. (bold added)

42. It is readily apparent that Provident had its mind made up that after paying Dr. Alexander's claim for a little over five years that it was going to do whatever it had to in order to stop paying the benefits that were rightfully owed. Although Dr. Alexander appealed the decision, not surprisingly Provident upheld its own decision to discontinue paying benefits. In order to uphold its decision, it ignored a January 27, 2008, letter from Dr. Alexander wherein he informed Provident: (1) his previous suicidal ideation made him high risk to return to anesthesiology; (2) his previous addiction may have altered his neurochemistry; (3) gasified opiates are present in an OR setting and return to that setting would expose Dr. Alexander to them; (4) the functional score status (GAF) has no bearing on risk of relapse for opiate addiction; and (5) there simply was not an equal risk of prescribing opiates to himself as receiving them in a clinical setting when practicing anesthesiology.

43. Dr. Alexander further noted that Provident did not have the right under the policy to "arbitrarily" decide an "acceptable" level of risk for a fatal relapse by forcing him to return to the practice of anesthesiology. Of course, Provident had already determined that it would stop paying benefits and nothing that either Dr. Alexander or his treating physicians told Provident

12

would change its mind. Accordingly, it disregarded the February 2008, note from Dr. Alexander's Psychiatrist wherein he stated in relevant part:

> I have been Dr. William Alexander's psychiatrist and addictionist since 2003. I have treated him for his opiate addiction and for depression. He has been & sober since 2003 and has suffered from anxiety and depression, but has been treated with medication and therapy with some success. **He tried to return to anesthesia in 2002 after his inpatient treatment in 2001, but relapsed dangerously. . . .It has been my opinion and is my opinion that is unsafe for him to return to the practice of anesthesia**. He would certainly be very prone to relapse if this was done. **I recommend he never practice anesthesia due to his chemical dependency problem and depression**." (bold added)

44. Likewise, Provident disregarded a February 25, 2008, letter from Dr. Cynthia Wheeler which stated: "I have consistently reported to you since clients relapse that he would never be able to return to anesthesiology." She further noted in the letter six clinical factors that precluded Dr. Alexander from working in clinical anesthesiology. Again, Provident disregarded the information contained in the letter.

45. As of this date, Provident refuses to pay Alexander benefits rightfully owing to him under the policy.

## CAUSES OF ACTION

### Count I
### Bad faith pursuant to Tennessee Code Annotated § 56-7-105

46. Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

47. Alexander has a disability policy issued by Defendant and Alexander has suffered a loss under that policy and Alexander is entitled to disability benefits. Commencing in October 2007, Defendant refused to pay the loss. Alexander has made demand since that time that Defendant pay the loss and Defendant has refused to do so. Defendant has had more than sixty (60) days in which to pay the loss and has refused to do so. Defendant's refusal to pay the loss

13

was not in good faith, and Defendant's failure to pay the loss has inflicted additional expense, loss, or injury including attorney fees upon Alexander.

Wherefore, Plaintiff seeks all damages available to him according to proof at trial, including but not limited to prejudgment interest, a statutory penalty of 25% of the loss incurred, as well as any and all other relief to which he may be entitled.

## Count II
## Violation of Tennessee's Consumer Protection Act

48. Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

49. Alexander has suffered an ascertainable loss of money and/or property as a direct result of Defendant's conduct in refusing to pay properly owed benefits. Defendant's denial to pay benefits was the result of the use or employment of an unfair or deceptive act or practice, including but not limited to Defendant's failure to give credence to Alexander's treating physicians' repeated statements that he cannot practice anesthesiology as well as their own hired independent medical consultants.

50. Defendant's conduct constitutes a willful and or knowing violation of the Tennessee Consumer Protection Act.

Wherefore, Plaintiff seeks all damages available to him according to proof at trial, including but not limited to prejudgment interest, a statutory penalty of treble damages, as well as any and all other relief to which he may be entitled.

## Count III
## Breach of Contract

51. Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

52. Alexander has a policy of disability insurance with Defendant for which he has paid premiums for years. Defendant received his payments. After Alexander became disabled he continued to pay premiums in accordance with the terms of the policy. Alexander also performed all obligations required of him under the terms of the policy.

53. In October of 2007, Defendant breached the terms of the policy by refusing to pay Alexander benefits that were rightfully owed under the policy. Defendant's refusal to pay rightfully owed benefits is a breach of the contract. Alexander has suffered damages as a direct and proximate result of Defendant's breach.

Wherefore, Plaintiff seeks all damages available to him according to proof at trial, including but not limited to prejudgment interest, post judgment interest, as well as any and all other relief to which he may be entitled.

*/s/ Peter H. Burke*
Peter H. Burke, Esq.
Tennessee Bar No.: BRP# 024012
Attorney for Plaintiff

**OF COUNSEL**:

Gregory J. McKay, Esq.
Burke Harvey & Frankowski, LLC
2151 Highland Avenue
Suite 120
Birmingham, Alabama 35205
Phone: 205-930-9091
Fax:     205-930-9054

**PLAINTIFF HEREBY DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS TO WHICH HE IS ENTITLED**

## CERTIFICATE OF SERVICE

This is to certify that I have this day, the 2nd day of February, served a true and correct copy on the following parties via United States Certified Mail, properly addressed with sufficient postage affixed thereto to ensure delivery to:

David Layden, Esq.
18 Chestnut Street
Worcester, MA 01608

Peter H. Burke