UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| DR. WILLIAM ALEXANDER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PROVIDENT LIFE AND ACCIDENT )<br>INSURANCE COMPANY, )<br>)<br>Defendant. ) | No. 1:09-CV-27<br><br>Chief Judge Curtis L. Collier |

## **MEMORANDUM**

Before the Court are cross motions for partial summary judgment filed by Provident Life and Accident Insurance Company ("Defendant") (Court File No. 14) and Dr. William Alexander ("Plaintiff") (Court File No. 22). The Court has considered both motions for partial summary judgment as well as the responses in opposition and parties' supporting briefs and documentation (Court File Nos. 14, 15, 16, 19, 20, 21, 22, 23 and exhibits thereto). For the following reasons, the Court will **GRANT** Defendant's motion for partial summary judgment (Court File No. 14) and will **DENY** Plaintiff's motion for partial summary judgment (Court File No. 22).

### I.  **RELEVANT FACTS**

In April 1991, Plaintiff began employment with Arthur S. Keats, M.D. Associates ("Associates") and applied for a disability insurance policy from Defendant. (Court File No. 15-1 ("Mitchell Aff."), Ex. 6). Associates and Defendant had an arrangement evidenced by a "Salary Allotment Agreement" dated October 1981, whereby Defendant offered a group discount for

Associates to sponsor a disability insurance plan (Mitchell Aff. ¶ 4, and Ex. 1). Pursuant to this agreement, Defendant would issue individual policies to employees whom Associates chose to include. Associates assumed responsibility for paying the premiums under a common billing invoice and in exchange, Associates received a ten percent discount (Mitchell Aff. ¶¶ 4-8, Exs. 1, 2). Defendant maintained these policies under a single risk group number related solely to that employer (Mitchell Aff. ¶¶ 6-8, Exs. 1, 2). Associates paid approximately 35% of the premiums of its employees' policies and the employee paid 65% of the cost (Court File No. 19-1, Ex. A ("Mitchell Amended Aff.") pp. 2-3, ¶¶ 6-7).

Defendant provided individually numbered policies to eligible employees of Associates and these policies were classified as an employer-sponsored group, Risk Group Number 25325 (Mitchell Aff. ¶ 7). When Plaintiff joined Associates in 1991, he was issued a disability policy through this arrangement. Plaintiff met with Michael B. Kashar ("Kashar"), an insurance agent for Defendant to discuss his disability policy and coverage needed (Court File No. 16-1, Exh. K ("Alexander Dec."), ¶¶ 3-4). When Plaintiff completed his application he indicated that his employer would pay for all disability coverage "to be carried by you with no portion of the premium to be included" in his taxable income (Mitchell Aff. Ex. 6). However, as discussed above, Plaintiff paid approximately 65% of his premiums with Associates paying the other 35% (Mitchell Amended Aff. ¶¶ 6-7, Exs. 1, 2).

During Plaintiff's employment with Associates, insurance premiums were paid pursuant to the Salary Allotment Agreement and Associates received list bills for the policies under Risk Group 25325. (Court File no. 16-1, Ex. J); (Mitchell Aff. ¶¶ 6-12, Exs. 1,2,4,6,9); (Mitchell Amend. Aff. ¶¶ 6-7, Ex. 1). Plaintiff does not dispute Associates contributed to his premiums, but asserts he

2

"would reimburse Associates for the amount it forwarded to" Defendant (Alexander Dec. ¶ 6). In April 1996, Defendant sent a letter to Plaintiff informing him of a new premium owed on his policy beginning July 1, 1996, and it referred to concerns of Plaintiff that his policy "be issued on a step-rate basis with premiums low enough in the early years to enable you to obtain a realistic amount of insurance" (Mitchell Aff. Ex. 3).

Plaintiff's employment with Associates ended in July 1997 (Alexander Dec. ¶ 2). Per the terms of the original policy, the coverage was "non-cancellable and guaranteed continuable at guaranteed premiums to your 65th birthday or for five years, whichever is later" (Mitchell Aff. Ex. 3 at UNUM-ALEX-0015). This provision allowed Plaintiff to continue the policy by paying premiums on time at the same discounted rate he received through Associates (Mitchell Aff. Ex. 8). On October 17, 1997, Defendant sent Plaintiff a letter offering to continue this policy and requesting Plaintiff to remit payment before November 17, 1997 (*Id.*). The letter also indicated that "[i]f we do not receive [payment] by this date, your coverage will be terminated as of the above paid-to date" (*Id.*). The paid-to date of the letter was October 1, 1997. Plaintiff remitted a check to Defendant on November 28, 1997, along with the signed offer letter indicating "yes. I want to continue this coverage" (Mitchell Aff. Ex. 8; Court File No. 16-1, Ex. L). This payment placed Plaintiff's policy "back in force on an individual payment basis" with an effective date of October 1, 1997 (Mitchell Aff. Ex. 7). The policy number of "0007058538" referenced in the offer letter was the same number that had accompanied Plaintiff's policy during his employment with Associates (Mitchell Aff. Ex. 8).

Plaintiff submitted a claim for disability benefits to Defendant in December 2002 (Mitchell Aff. ¶ 14, Ex. 11). Defendant paid benefits to Plaintiff using an initial date of disability of August

3

23, 2002, and continued paying benefits until October 21, 2007 (*Id.*). Defendant notified Plaintiff in a letter dated October 31, 2007, Plaintiff no longer met the definition of Total Disability or Residual Disability and benefits would be discontinued (*Id.*). Associates's group was terminated on January 1, 2007, because Dr. Keats retired and was no longer employing any physicians (Court File No. 16-1, Exh. C ("Resp. to Plaintiff's Interrog."), No. 9).

On February 3, 2009, Plaintiff filed a three-count complaint, alleging Defendant engaged in breach of contract, breach of duty of good faith, and violation of the Tennessee Consumer Protection Act and asserting jurisdiction is proper under 28 U.S.C. § 1332 (Court File No. 1 ¶¶ 3, 46-53). Defendant answered, claiming the policy at issue is an employee benefit plan covered by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), thus rendering Plaintiff's action a claim for benefits under an ERISA plan and invoking federal question jurisdiction under 28 U.S.C. § 1331 (Court File No. 10). Defendant and Plaintiff have now submitted cross motions for partial summary judgment on the issue of whether or not Plaintiff's policy is covered by ERISA (Court File Nos. 14, 22).

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the

4

non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III.    DISCUSSION**

Defendant alleges the policy at issue in this case is part of an employee welfare benefit plan governed by ERISA. If Defendant is correct, Plaintiff's state law claims relating to that policy are preempted and federal law applies to determine recovery. *See* 29 U.S.C. § 1144(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-57 (1987). "[T]he existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429 (6th Cir. 1996). An "employee welfare benefit plan" is defined by ERISA as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . ."

5

29 U.S.C. § 1002(1). The United States Court of Appeals for the Sixth Circuit has developed a three-step factual analysis for determining whether a benefit plan satisfies the statutory definition set out in § 1002(1). *Thompson*, 95 F.3d at 434 (6th Cir.1996). *See also Agrawal v. Paul Revere Life Ins. Co.,* 205 F.3d 297, 299-300 (6th Cir.2000). First, a court must apply the Department of Labor "safe harbor" regulations to determine whether the program is exempt from ERISA. *Thompson,* 95 F.3d at 434. Second, a court should determine whether there was a "plan" by considering whether, from the surrounding circumstances, a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for obtaining benefits. *Id.* at 435. Finally, a court should determine whether the employer "established or maintained" the plan with the intent of providing benefits to its employees. *Id*.

### A.     Applicability of the "Safe Harbor" Provision

Regulations promulgated by the Department of Labor provide a "safe harbor" provision excluding an employee insurance policy from ERISA coverage if: (1) the employer makes no contribution to the policy; (2) the employee's participation in the policy is completely voluntary; (3) the employer's sole functions are, without endorsing the policy, to permit the insurer to publicize the policy to employees, collect premiums through payroll deductions, and remit them to the insurer; and (4) the employer receives no consideration in connection with the policy other than reasonable compensation for administrative services actually rendered in connection with payroll deduction. 29 C.F.R. § 2510.3-1(j). Plaintiff claims his disability policy is exempt from ERISA because there are material questions of fact as to who actually paid the premiums related to the policy and whether Associates "endorsed" the plan (Court File No. 16, p. 4).

Defendant disputes these assertions and argues this is an ERISA policy because Associates

6

contributed to the premiums and it was part of an employee welfare benefit plan (Court File No. 15, p.2). Defendant has submitted an affidavit signed by one of Defendant's chief underwriters, Charles Mitchell, indicating Associates paid approximately 65% of premiums due on their employees' policies while Plaintiff was employed there (Court File No. 19, Ex.1 "Mitchell Amended Aff." ¶¶ 6-7). Attached to the amended affidavit is a check for approximately 35% of Plaintiff's premium submitted to Defendant in January 1997 along with a check submitted by Plaintiff for the remaining 65% (Mitchell Amended Aff. Ex. 1). Attached to Mitchell's original affidavit is Plaintiff's application for the policy at issue, which contains the following question, "will your employer pay for all disability coverage to be carried by you with no portion of the premium to be included in your taxable income?" to which Plaintiff checked "Yes" (Mitchell Aff. Ex. 6).

Plaintiff points to his meeting with Kashar, the insurance broker as evidence Associates was not involved in negotiating the amount and extent of coverage. He also refers to the April 1996 letter from Defendant indicating the increase in premium as evidence that he was responsible for payment (Court File No. 16 p. 9). Plaintiff asserts in his declaration although Associates paid the premium on his policy to Defendant, he reimbursed Associates for the amount it forwarded (Alexander Dec. ¶ 6). However, Plaintiff has not offered any evidence in support of this allegation, such as a pay stub showing the deduction for his premium payment, or a canceled check made out to Defendant in the amount of the premium.[1] Plaintiff's submitted evidence does not create an issue

---

[1] Plaintiff has submitted a cancelled check dated November 28, 1997, for the full amount of his premium (Court File No. 16-1, Ex. L) as well as a transmittal letter dated February 27, 2003, from Defendant issuing Plaintiff a refund of the premium paid for October 2002 (Court File No. 16-1, Ex. H). These both occurred after he left his employment with Associates in July 1997 and his payment of premiums after his employment ended is not in dispute. Plaintiff's continuation of his policy is discussed further in section **III D.**

of fact on whether or not Defendant contributed to Plaintiff's policy during his employment. Plaintiff's policy and the correspondence from Defendant, which Plaintiff did submit (Court File No. 16, Ex. H), contain no evidence he, not his employer, always paid the premiums himself. Even if Plaintiff had in fact, reimbursed Defendant the full amount of the premiums, the Defendant could still be found to have contributed the policy based on the extension of the ten percent discount to the employees based on their negotiated Salary Allotment agreement. *See Tannebaum v. Unum Life Ins. Co. of Am.*, 03-CV-1410, 2006 WL 2671405 at *6 (E.D. Pa. Sept. 15, 2006) (citing multiple decisions concluding a discount on an insurance policy premium constitutes an employer contribution). Therefore, the Court finds Plaintiff has not demonstrated a factual dispute as to whether Associates paid approximately 35% of premiums on Plaintiff's policy while he was employed there, and the first criterion of the "safe harbor" provision is not satisfied. Because each of the criteria must be met in order for a policy to be exempted under the "safe harbor" provision, the Court need not consider whether Plaintiff's policy satisfied the second, third, or fourth criteria. *See Thompson*, 95 F.3d at 435.

**B.    Existence of a "Plan"**

The Court must next determine whether a "plan" existed, that is whether "'from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.'" *Int'l Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)). An ERISA plan may consist of individual disability policies covering each of the employer's employees, rather than a group policy. *See Mass. Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997) (noting the employer "bought five or six individual policies" which were

governed by ERISA). Plaintiff does not make any arguments the benefits, beneficiaries, and procedures for receiving benefits were not readily discernible from the policy itself. As articulated above, Defendant has provided evidence demonstrating Associates, did, in fact, pay a portion of the premiums during the time Plaintiff was employed there. Plaintiff has not briefed this issue and does not dispute the existence of a "plan" while employed at Associates. Rather, Plaintiff asserts his policy was converted to an individual policy when he left Associates.

In *International Resources*, the court found the facts the company chose the plan, paid the premiums, and gave coverage to all its employees as an employee benefit persuasive enough to find an ERISA plan existed. *Int'l Resources*, 950 F.2d at 298. These same factors persuade this Court to hold an ERISA plan existed here. Defendant has shown Associates paid a portion of premiums for covered employees and gave coverage to at least a class of physician employees as an employee benefit (Mitchell Amended Aff. 1 ¶¶ 6,7, Ex. 1). In addition, Associates received a 10 percent discount for its policies because it agreed to remit the premiums for all policies under a common billing invoice or "Risk Group" (Mitchell Aff. ¶ 8). The price and terms of the policy obtained by Plaintiff do not appear to have been attainable other than by virtue of his employment at Associates. (*see* Mitchell Aff. ¶ 10, "Had Dr. Alexander applied for this coverage apart from the Associates Allotment Plan and represented that he would pay the premiums himself, then he would not have obtained this discount").

The reasonable person test does not mean a specific employee has to know a plan is governed by ERISA; rather, it means if a reasonable person in possession of the facts would be able to discern that a plan existed, then that plan is possibly an ERISA plan. *Nicholas v. Standard Ins. Co.*, 2002 WL 31269690 at *6 (6th Cir. Oct. 9, 2002). Associates took steps to provide at least a

9

class of its employees with partially funded disability policies. *See B-T Dissolution, Inc. v. Provident Life and Acc. Ins. Co.*, 101 F. Supp. 2d 930, 940 n. 16 (S.D. Ohio 2000) (coverage through individual rather than group policies "does not detract from the potential existence of an ERISA plan"). The steps taken by Associates were sufficient to create a "plan."

### C. Established or Maintained

Finally, the undisputed evidence shows Associates "established or maintained" the plan with the intent of providing benefits to its employees. Associates established the plan by entering the Salary Allotment Agreement with Defendant and establishing a "Risk Number" for group billing (Mitchell Aff. ¶¶ 6-12, Exs. 1,2,4,6,9) ). Associates maintained the plan by paying a portion of the premiums each pay cycle (Mitchell Amended Aff. ¶¶ 6-7, Ex.1). The clear intent of Associates was to provide a benefit to designated physician employees. Plaintiff has not briefed this aspect of the *Thompson* three-part test and based on evidence presented, there is no factual dispute as to whether Defendant has satisfied this requirement.

The Court concludes, based on its application of the *Thompson* test, the record undisputably establishes Associates' benefit plan satisfies the statutory definition set out in § 1002(1) and Plaintiff's disability insurance policy, during his employment with Associates, was governed by ERISA.

### D. Continuance of Policy

Plaintiff contends when he left his employment there are material questions of fact as to whether the policy was converted into an individual one or continued as the same policy. In support, Plaintiff points to the Defendant's internal memorandum documenting receipt of Plaintiff's individual payment thus putting his policy "back in force" on "an individual payment basis" with

10

an effective date of October 1, 1997. Plaintiff also cites his remittance of a premium check dated November 28, 1997, eleven days after the deadline indicated in the offer letter from Defendant to continue his coverage, as evidencing a lapse in Plaintiff's policy through Associates. Defendant argues ERISA continued to govern Plaintiff's policy even after Plaintiff began paying the payments himself because the policy remained unchanged. Defendant cites the same offer letter as Plaintiff to evidence Plaintiff's response "YES. I want to continue this coverage" and the continuation of the same monthly benefit, discounted premiums and terms and conditions as under Plaintiff's policy during his employment with Associates.

The Sixth Circuit has acknowledged the distinction between continuation and conversion coverage in determining whether a policy is covered by ERISA. *Mass. Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997). An ERISA policy is converted when a "participant leaves the plan and obtains a new, separate, individual policy based on conversion rights contained in the ERISA plan." *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 876 (9th Cir. 2001). In cases where conversion occurs, the insured has exercised an express right to convert the policy and the right to convert was part of the original policy. *See Waks*, 263 F.3d at 874 ("[plaintiff] applied for individual coverage with [insurer] pursuant to the conversion rights of the group policy."); *Demars v. Cigna Corp.*, 173 F.3d 443, 444 (1st Cir. 1999) (finding state law claims not preempted by ERISA where plaintiff, after her employment ended, used her policy's "conversion clause" to "convert from group disability coverage to individual policies" at the end of her employment.); *Powers v. United Health Plans of New England, Inc.*, 979 F. Supp. 64, 65 (D. Mass. 1997) (determining plaintiff's claims not governed by ERISA where plaintiff "submitted a 'Conversion Application' to [insurer] for a 'non-group policy'"). Here, Plaintiff does not assert there was a conversion clause in his policy,

11

and other than a different prefix to his policy number,[2] does not point to any changes to the terms or conditions of the policy itself.

Plaintiff continued his existing policy when he remitted his payment in November 1997. Upon leaving Associates, Plaintiff elected to continue his disability policy, continued to receive the same discounted rate, and was assigned to a new risk number for policyholders who are billed directly. Other than Plaintiff taking over payment of the premiums, his disability policy remained in force without change. As a matter of law, Plaintiff's individual payment of premiums after leaving Associates does not convert the policy to a new, individual policy outside the governance of ERISA. *Reynolds*, 113 F.3d at 1453; *Halliburton v. UnumProvident Corp., et al,* 1:04-CV-62, Court File No. 15, p. 7 (E.D. Tenn. July 13, 2004) (finding plaintiff's claims governed by ERISA when "other than [p]laintiff himself taking over payment of the premiums, his disability policy remained in force without change"); *Vincent v. UnumProvident Corp.*, 1:04-CV-340, 2005 WL1074370 at *2-3 (E.D. Tenn. May 5, 2005) (determining ERISA applied where plaintiff continued coverage he acquired by virtue of his employment, continued to receive a discounted rate, and the only change was he took over payments).

This is not a situation involving an individual conversion policy, but rather a continuation of the identical coverage under identical terms as initially acquired by virtue of the previous employment relationship. Plaintiff continued to pay the same monthly premiums, including the

---

[2] Plaintiff asserts he was assigned a different policy number after he remitted his check in November 1997. He cites the policy number of "042556-06-0007058538" while he was at Associates and points to the new number when he began paying the premiums individually, "6-337-7058538." The last seven digits, 7058538, are identical and absent any other indication of a change in policy, this on its own is merely speculative and does not create a factual dispute on the continuance of Plaintiff's policy.

12

discount originally offered through Associates. He completed a form indicating he wanted to continue coverage and his policy remained unchanged other than the manner in which it was billed. Furthermore, his policy was originally set up as an individual policy under the Associates' Group and there was no need for conversion from a group policy to an individual policy as in the *Waks* and *Powers*. In *Falcone, M.D. v. Provident*, presenting similar facts, the court determined ERISA governed the policy at issue because: (1) the policy originated through an employee benefit plan; (2) language in the policy provided the right to continue, (3) the policy number remained the same post-employment, (4) the insured continued to benefit from the premium discount and premiums did not change, (5) the terms of the policy remained unchanged post-employment, and (6) post-employment, the employer's employee benefit plan continued to operate. *Falcone, M.D. v. Provident*, 2:08-CV-300, 2009 WL2869988 at *9 (S.D. Ohio Sept. 9, 2009).

Applying the *Falcone* factors, the Court determines Plaintiff's policy continued to be covered by ERISA after he left Associates in July 1997. Plaintiff obtained this policy through the Salary Allotment Agreement established by Associates. The policy did not contain a conversion clause but did allow for guaranteed "continuable coverage until insured's 65th birthday or for five years; whichever is later" (Mitchell Aff. Ex. 3 at UNUM-ALEX-0015). The policy number remained the same post-employment, and Plaintiff continued to benefit from the discount offered to Associates and neither his premiums nor the terms of his policy changed. Plaintiff's payment of his premium after the deadline to continue his policy does not lead to the conclusion his original policy lapsed and a new policy was issued. The memorandum from Defendant states Plaintiff's policy "lapsed on the Salary Allotment Plan shown and we have received remittance in his behalf to place back in force on an individual payment basis" (Mitchell Aff. Ex. 7). Plaintiff's coverage through Associates

13

was in effect until October 1, 1997, and Plaintiff's individual payment in November allowed this policy to continue with an effective date of October 1, 1997. (Mitchell Aff. ¶ 11). Finally, post-employment, Associates' benefit plan continued to operate. Plaintiff continued his individual payment of premiums and did not file his first claim until December 2002. Associates' risk group continued to operate until 2006. Although this factor is distinguishable from *Falcone*, in that Associates' benefit plan is no longer in operation, this does not alter the Court's conclusion. As a matter of law, Plaintiff's policy continued to be governed by ERISA after he left Associates and his individual payment of premiums did not effectuate a conversion.

### E. Status of Policy after Termination of Associates' Plan

Plaintiff contends even if his plan was not converted into an individual policy, on January 1, 2007, when Associates no longer had employees, the "Plan" ceased to exist and thus, Plaintiff's claims that arose from denial of benefits in October 2007 are not governed by an existing employee welfare benefit plan. It is undisputed Associates' risk group had ceased doing business by January 1, 2007, at the latest. Plaintiff's claim arose from a denial of benefits in October 2007 and at this point in time, Associates no longer had employees or a group plan. Plaintiff cites *Bates v. Provident Life and Accident Ins. Co.*, 596 F. Supp. 2d 1054 (E.D. Mich. 2009) in support of his argument by the time his claim for benefits arose, the plan was no longer governed by ERISA. Defendant distinguishes *Bates* as it relies on a line of precedent dealing with employee pension benefit plans and not employee welfare benefit plans. Defendant further distinguishes *Bates* because in that case, claims for benefits were made after the plan no longer had employees.

The ERISA status of an employee welfare benefit plan, as opposed to a pension plan, has a different focus as the "definition of an employee welfare benefit plan focused on the past, whereas

14

the definition of a pension plan focused on the present." *In re Stern*, 345 F.3d 1036, 1041 (9th Cir. 2003). An ERISA qualified welfare benefit plan is defined as one "established or maintained. . . for the purpose of providing [benefits] for its participants or their beneficiaries[.]" 29 U.S.C. § 1002(1). By contrast, a pension plan is ERISA-qualified only "to the extent that by its express terms or as a result of circumstances [the pension plan] provides retirement income to employees..." 29 U.S.C. § 1002(2)(A)(i). "Thus, *In re Stern* makes clear that the ERISA status of an employee welfare benefit plan is determined at the time the plan is established, regardless of whether the plan participants change." *Leonard v. Educators Mut. Life Ins. Co.*, 620 F. Supp. 2d 654, 664-65 (E.D. Pa. 2007). Continued application of ERISA throughout the existence of the policy is consistent with Supreme Court precedent. *Id*. at 666 ("the Supreme Court's decision in *Yates* can be read to suggest that a plan should not lose ERISA status once it has been deemed an ERISA plan.") (citing *Yates v. Hendon*, 541 U.S. 1, 16-17 (2004)).

The Sixth Circuit has incorporated the *Yates* reasoning, supporting the policy of avoiding "the anomaly that the same plan will be controlled by discrete regimes . . . the ERISA policy of uniform regulation dictates a finding that single plan may not be variously governed by both ERISA and state law depending on the particular employee in question." *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 390 (6th Cir. 2009). Although *Helfman* and *Yates* involve disparities between individuals on a plan, the Court finds the reasoning applies to disparities within the same policy. The Court has determined Plaintiff's policy was part of an employee welfare plan at its establishment, and this policy continued to be governed by ERISA when Plaintiff left his employment with Associates and through the time he made his claim for disability benefits in December 2002. It would create the very anomaly *Yates* and *Helfman* seek to avoid to find the policy stopped being

15

governed by ERISA during the time Plaintiff was receiving disability benefits because Associates risk group was terminated. *See Leonard*, 620 F. Supp. 2d at 666 (referring to the Supreme Court's concerns in *Yates* "that the same plan will be controlled by discrete regimes, it would seem equally problematic for a plan to be deemed an ERISA plan at its inception thus having federal law apply . . . only to have it subsequently lose its status and be governed by state law.")

The Court concludes as a matter of law the Plaintiff's policy as it was established is governed by ERISA, the policy was not converted at the time Plaintiff left his employment and the policy continues to remain unchanged despite the termination of the original risk group. Thus, ERISA continues to govern Plaintiff's policy.

### F. PREEMPTION OF STATE LAW CLAIMS

Because the Court has determined ERISA governs Plaintiff's policy with Defendant, all state law claims that relate to this policy are preempted. 29 U.S.C. § 1144(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-57 (1987). Plaintiff's three-count complaint alleges breach of contract, breach of duty of good faith, and violation of the Tennessee Consumer Protection Act arising out of a denial of disability benefits under his policy with Defendant. These claims directly relate to Plaintiff's disability policy and are preempted by ERISA. *See Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) (preempting breach of contract claim); *Cox v. Blue Cross and Blue Shield of Michigan*, 869 F.Supp. 501, 504-505 (E.D.Mich. 1994) (preempting breach of contract and Consumer Protection Act claims where the suit is essentially to recover benefits from an ERISA plan); *Int'l Resources*, 950 F.2d at 297 (preempting bad faith claim).

### IV. CONCLUSION

Because the disability insurance policy which forms the basis of Plaintiff's claims is an employee welfare benefit plan governed by ERISA, the Court will **GRANT** Defendant's Motion for Partial Summary Judgment (Court File No. 14) and **DENY** Plaintiff's motion for summary judgment (Court File No. 22). Plaintiff's state law claims are preempted by ERISA and will be **DISMISSED**. The Court will **ORDER** Plaintiff will have 30 days to file an amended complaint before the case will be closed.

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**